**FIRST DIVISION
BARNES, P. J.,
MCMILLIAN and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**October 31, 2017**

# In the Court of Appeals of Georgia

A17A1257. HEALTHY-IT, LLC et al. v. AGRAWAL et al.

McMILLIAN, Judge.

This case arises from the breakup of a joint venture company named Healthy Panacea Network LLC ("HPN"), which was formed to develop medical technology. HPN was governed by an Operating Agreement, pursuant to which ownership of HPN was split equally between two members – (1) Panacea Medical MBA, LLC ("Panacea Medical"), a holding company which had been created by Dr. Subodh K. Agrawal ("Agrawal"),[1] and (2) Healthy-IT, LLC, a Georgia limited liability company formed

---

[1] Agrawal was also the owner of and practiced out of Athens Heart Center, P.C. ("AHC"). AHC, Agrawal, Panacea Medical, and HPN will be collectively referred to as "Appellees."

by Dr. Mohamed Ahmed Hammady Ahmed ("Hammady")[2] and Dr. Adel Mohamed Fathy for the purpose of entering into the joint venture. As set out in the Operating Agreement, the primary business of HPN was for Healthy-IT[3] to complete the development of electronic medical record software[4] ("the EMR software") and in particular, to bring it in compliance with regulations promulgated by the Office of the National Coordinator for Health Information Technology ("ONC"), as well as to develop "a complete solid integration"[5] between software that Healthy-IT Egypt had already developed, called TelePax, and the EMR software with HPN having the exclusive right to market and sell the integrated system in the United States. The

---

[2] Because the parties use "Hammady," not Ahmed in their briefs, we will do so also.

[3] The evidence appears to be undisputed that although the Operating Agreement specified that Healthy-IT would act as the developer, Heathy-IT of Egypt, a LLC previously formed by Hammady and Fathy, employed the developers who actually worked on the software. Healthy-IT, Healthy-IT Egypt, Hammady and Fathy will be referred to collectively as "Appellants."

[4] Software engineers for AHC/Panacea Medical had developed the code for the EMR software before the joint venture was initiated.

[5] Hammady explained in his deposition that the products would be packaged and sold together but not actually combined into a single product.

Operating Agreement also purported to describe how Healthy-IT would be reimbursed for the development costs of the EMR software.

During the next stage of the venture, Agrawal was generally in charge of sales and marketing, and Hammady was in charge of the technical aspects of the project. Panacea Medical, with money provided by Agrawal, contributed the funds to actually operate the venture, including hiring marketing staff. Hammady started working on the project at offices provided to him at AHC, and Healthy-IT began working on developing the EMR software. However, according to Hammady, there were unanticipated problems with the software development and that part of the project did not progress as quickly as expected. Agrawal eventually began beta testing the software[6] using AHC's medical records in May 2013. It appears undisputed, however, that no outside sales were ever made of the EMR software. The TelePax software, on the other hand, continued to be refined,[7] and HPN began to sell licensing agreements to a cloud version of that product.

---

[6] Where necessary, we will refer to this version as "EMR II."

[7] Hammady admitted these refinements were made with Agrawal's input, and Appellees assert they were made possible in part through their capital investments.

According to Appellants, despite the fact that there had been no sales of the EMR software, HPN's tax return showed it had received income or revenue for tax years 2011-2013, and Healthy-IT, through Fathy and Hammady, began demanding to be paid for its costs in developing the EMR software. Although Agrawal maintained he did not think Healthy-IT had a right to be paid under the terms of the Operating Agreement because there had been no sales of the EMR software and most of the money on the tax return reflected investments by Panacea Medical in the company, he ultimately paid Healthy-IT $25,000, which Agrawal said was to keep Hammady working on the project because he believed that the EMR software was close to being ONC compliant. However, Agrawal testified that it reached a point where he could not make any more monetary investments in the venture. HPN began to terminate employees, and by summer 2013 the parties began to explore ways to wind down the joint venture, which the parties at first hoped would be amicable.

At that point, Hammady was the only person who had the pass codes for access to HPN's servers, which were housed at a data center named Cirracore, and it was initially agreed that he would provide support for the medical records and customer information they had stored there. But their relationship continued to deteriorate, and Hammady quit going to his office at AHC's building and, according to Agrawal,

4

would not get in contact with him when he needed him, although he maintained some contact through his lawyer.

By the beginning of August 2013, Agrawal still did not have the pass codes to HPN's servers, which held not only the medical images for customers who had purchased the PaxBox system, but also medical records from AHC, which had been placed in this system when the beta testing of the EMR software began. After Agrawal contacted Athens-Clarke County Police Department and told them that Hammady had stolen sensitive information from the company, the police prepared a report of that meeting, which contained the notation "FURTHER INVESTIGATION" beside the caption "Case Status/Disposition." A few days later, Agrawal sent an email to Cirracore employee Fred Tanzella, informing him that Hammady was under investigation by the Clarke County Police Department for theft by deception and that he was replacing Hammady as the primary contact for HPN, but the email also instructed Tanzella to keep Hammady as the technical contact and to log all of his activity inside the data center as well as any remote activity on the servers.

Hammady and Agrawal met with their attorneys, and Hammady testified he offered to provide Agrawal with his patient records but said he would not give him the source code for EMR II because Healthy-It had not been paid for its work and

5

because it possibly had a "bug" in it. Subsequent to this meeting, Appellants also contacted HPN's customers and told them that HPN had lost its license to distribute TelePax/PaxBox, that the service was no longer available from HPN, and that they needed to either go to a different vendor or transfer their licensing agreements to Healthy-IT.

A few weeks later, AHC, Panacea Medical, and HPN filed suit against Appellants for violation of the Georgia Computer Systems Protection Act, misappropriation of trade secrets, promissory estoppel, tortious interference with contracts, money had and received, breach of fiduciary duty, breach of contract, civil conspiracy, punitive damages, and attorney fees.[8] Appellants answered and counterclaimed, as later amended, for breach of contract, tortious interference with contracts, conversion, defamation per se, computer trespass, civil conspiracy, punitive damages, dissolution of HPN, and attorney fees.

Appellants subsequently moved to add Agrawal as a defendant in counterclaim, and the trial court granted the motion. In the order granting the motion, the trial court specifically ordered Agrawal to file an answer to Appellants' second amended

[8] Not all claims were asserted by all plaintiffs against all defendants, and those distinctions will be set out below as relevant to the resolution of the issues presented by this appeal.

counterclaim within thirty days after the service of the summons and counterclaim. Agrawal was served with Appellants' second amended counterclaim, and a summons was issued requiring Agrawal to respond to the filing, although the record does not show if the summons was also served on Agrawal. In any event, Agrawal never filed an answer or other responsive pleading.

Appellees filed a motion for partial summary judgment on Appellants' counterclaims for tortious interference with contracts, defamation, conversion, computer trespass, and breach of contract. Appellants then filed an "Omnibus Motion for Partial Summary Judgment" seeking summary judgment on their claims for breach of contract, defamation per se, conversion and computer trespass, and on all claims asserted by plaintiffs in their complaint. A short while later, the parties filed a joint motion to consolidate Appellants' claims with a separate defamation action Hammady had filed against Agrawal in another county, and the trial court granted the motion.

On November 17, 2015, Appellants sought a default judgment against Agrawal based on his failure to file an answer to Appellants' second amended counterclaim after he was added as a party-defendant. The trial court entered an order granting the default but reserved the issue of damages for the jury on all but one claim. Agrawal

7

subsequently moved to set aside the judgment and open default. Following a hearing, the trial court granted the motion to open default pursuant to OCGA § 9-11-55 (b).

Subsequently, the trial court entered a comprehensive order granting in part and denying in part the parties' respective motions for summary judgment. Appellants filed this appeal, arguing that the trial court erred by: (1) granting Agrawal's motion to open the default; (2) granting summary judgment to Appellees on Appellants' breach of contract counterclaim; (3) denying summary judgment on Hammady's defamation claim; (4) denying summary judgment to Appellants on Appellees' claims for misappropriation of trade secrets and promissory estoppel; and (5) denying summary judgment to Healthy-IT on Appellants' claims for tortious interference with contracts and breach of fiduciary duty. As more fully set forth below, we now affirm in part and reverse in part.

1. We turn first to Appellants' contention that the trial court erred by allowing Agrawal to open the default judgment.

OCGA § 9-11-55 (b)[9] gives the trial court discretion to open a prejudgment default on one of three grounds, provided four conditions are met. (Citation omitted.) *Karan, Inc. v. Auto-Owners Ins. Co.*, 280 Ga. 545, 547 (629 SE2d 260) (2006) ("Compliance with the four conditions is a condition precedent and once met the question of whether to open the default on one of the three grounds rests within the sound discretion of the trial court."). "[T]he sole function we have as an appellate court . . . is to ascertain whether all of the conditions delineated in OCGA § 9-11-55 have been satisfied and, if so, 'whether the trial court abused its discretion based on the facts peculiar to the case.'" *Strader v. Palladian Enterprises, LLC*, 312 Ga. App. 646, 649 (719 SE2d 541) (2011).

Appellants do not contend on appeal that the four conditions were not met or that the trial court abused its discretion under OCGA § 9-11-55 (b), but argue instead that the trial court should have applied OCGA § 9-11-60 (d) instead of the more liberal provisions of OCGA § 9-11-55 (b) because final judgment had been entered

---

[9] That section provides in relevant part that "*[a]t any time before final judgment*, the court, in its discretion, upon payment of costs, may allow the default to be opened for providential cause preventing the filing of required pleadings or for excusable neglect or where the judge, from all the facts, shall determine that a proper case has been made for the default to be opened, on terms to be fixed by the court." (Emphasis supplied.)

and thus the judgment had to be set aside before default could be opened.[10] See

*Granite Loan Solutions, LLC v. King*, 334 Ga. App. 305, 310 (3) (c) (779 SE2d 86)

(2015). It does not appear, however, that Appellants ever made this contention below.

Agrawal recited OCGA § 9-11-55 (b) in his motion to open the default judgment,

specifically arguing that "[t]his is not a final judgment so the liberal criteria of OCGA

§ 9-11-55 (b) apply[,]" and at no point in the proceedings below did Appellants

oppose this statement or contend otherwise. In fact, Appellants also framed their

arguments within the context of OCGA § 9-11-55 (b) without making any reference

to OCGA § 9-11-60 (d) and expressly referred to the fact that the trial court had

ordered a trial on damages. This Court does not apply a "wrong for any reason"

analysis and, accordingly, we will not consider Appellants' contention that Agrawal

failed to satisfy the requirements of OCGA § 9-11-60 (d) since this argument was

---

[10] Appellants make no specific argument as to why they believe the default was a final judgment. We note that just because the trial court may use the term "default *judgment,*" does not mean that a final judgment has been entered. Here, the trial court specifically directed the clerk to enter judgment *as to liability* (emphasis in original) and ordered a trial on damages on all the claims except one. *Griffin v. Rutland*, 259 Ga. App. 846, 847-48) (2) (578 SE2d 540) (2003) ("default judgment"that merely decided issue of liability did not dispose of entire controversy and, accordingly, did not constitute a final judgment to preclude application of OCGA § 9-11-55 (b)).

never raised below. *Gwinnett County v. Old Peachtree Partners, LLC.*, 329 Ga. App. 540, 549 (1) (d) (764 SE2d 193) (2014).

To the extent that Appellants are challenging the trial court's finding that a proper case had been made to open default, we reject that contention. The trial court specifically found there was no reason to doubt Agrawal's attorney's claim that he had not received a copy of the trial court's order requiring him to file an answer.[11] Further, the court also took some responsibility for the fact that the order may not have been sent to counsel due to the trial court's home office being located in another county. And we reject Appellants' contention that Agrawal had constructive notice that he was required to answer the counterclaim because Agrawal's attorney should have been aware of a proposed order, which would have required him to file an answer. Lastly, although Appellants argue in their reply brief that they were prejudiced by the opening of the default because they were deprived of the liquidated damages award on the breach of contract claim, we note that they continued to litigate this case for approximately nine months after Agrawal failed to file his answer.

---

[11] As Appellants acknowledged, Agrawal would not have been required to file an answer if the trial court had not ordered him to do so. See OCGA § 9-11-12 (a) ("A cross-claim or counterclaim shall not require an answer, unless one is required by order of the court, and shall automatically stand denied.").

*Shortancy v. North Atlanta Internal Medicine, P.C.*, 252 Ga. App. 321, 324 (1) (556 SE2d 209) (2001) ("plaintiffs have demonstrated no prejudice to their case by the opening of default, particularly since they waited 11 months after filing proof of service to move for entry of default judgment."). We discern no abuse of discretion under the circumstances of this case.

2. Appellants also argue that the trial court erred by granting summary judgment on their counterclaim for breach of contract, in which they sought to recover costs of up to $250,000 incurred by Healthy-IT in the development of the EMR software. Healthy-IT contends that it is entitled to recover these costs under Article I, Paragraph 9 of the Operating Agreement, which provides:

> All income of [HPN] shall be allocated first to reimburse all the Healthy-IT . . . development costs, and second all income of [HPN] shall be allocated to reimburse all costs of Panacea Medical . . . before any profits are paid to the parties.

Pointing to HPN's tax returns which show HPN earned "income," Healthy-IT argues it is entitled to recover its development costs under this section.

Appellees argue, however, that Appellants' claim for the recovery of their operating costs was governed by Article I, Paragraph 4 of the Operating Agreement:

12

> The parties agree that the Healthy-IT, LLC development cost for the EMR Software shall not exceed the sum of $250,000.00 and that the total development cost *shall* be paid to Healthy-IT *solely* from the funds generated from the sales of the EMR Software. (emphasis supplied.)

Appellees contend that because it is undisputed in this case that there were no sales of the EMR software, the trial court properly granted summary judgment to them on this claim.

Contract construction is a question of law to be determined by the court and involves three steps. First, the court must decide whether the plain language of the contract is clear and unambiguous. If it is, the contract is enforced as written according to its plain terms and no further construction is needed or allowed. However, if the language used in the contract is ambiguous, the court must apply the rules of contract construction to attempt to resolve any ambiguities. And if the ambiguities cannot be resolved by applying the rules of contract construction, then a jury must resolve the issue of what the ambiguous language means and what the parties intended. *Bd. of Commrs. of Crisp Co. v. City Commrs. of the City of Cordele*, 315 Ga. App. 696, 699 (727 SE2d 524) (2012); *White v. Kaminsky*, 271 Ga. App. 719, 721 (610 SE2d 542) (2004).

13

"[W]e have defined ambiguity to mean duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and it also signifies being open to various interpretations." (Citations and punctuation omitted.) *Shepherd v. Greer, Klosic & Daugherty*, 325 Ga. App. 188, 190 (750 SE2d 463) (2013). Or to put it more simply, "[a] word or phrase is ambiguous when its meaning is uncertain and it may be fairly understood in more ways than one." *Freund v. Warren*, 320 Ga. App. 765, 769, n.4 (740 SE2d 727) (2013).

The trial court found an ambiguity between Paragraphs 4 and 9 of the Operating Agreement. We agree. Paragraph 4 plainly states that Healthy-IT is only entitled to recover its development costs "solely" from the sale of the EMR software, yet Paragraph 9 just as plainly says Healthy-IT is entitled to be paid first from "all income" of HPN, which is clearly a more encompassing term. This confusion is compounded by Paragraph 10, which states that Healthy-IT "shall be reimbursed exclusively out of sales of [HPN]" without specifying what sales of HPN. Accordingly, we must turn to the rules of contract construction to attempt to resolve this ambiguity.

The preferred construction of a contract is that which upholds it in whole and in every part. OCGA § 13-2-2; *RLI Ins. Co. Highlands on Ponce, LLC*, 280 Ga. App.

14

798, 802 (1) (635 SE2d 168) (2006). The trial court, noting that Appellants' construction would render Paragraph 4 meaningless by eliminating the requirement that development costs were to be recouped solely from EMR software sales, interpreted Paragraph 9 "as simply requiring that reimbursement of the development costs would be the top priority of income earned from EMR [s]oftware sales" in an attempt to give meaning to both paragraphs. While we agree with the trial court this interpretation upholds Paragraph 4, this restrictive reading of the word "income" in Paragraph 9 in essence makes the word "all" meaningless. On the other hand, the trial court is correct that if the agreement is not interpreted this way, Paragraph 4 is read out of the agreement. Thus, the ambiguity remains and the intent of the parties remains unclear. Although parol evidence might aid us at this juncture in resolving this ambiguity, neither party has pointed us to any parol evidence that might shed light on what they intended in drafting the Agreement, and our review of the record has revealed none that aids us in resolving the ambiguity. And although Appellants urge that the contract should be construed against Appellees because Agrawal's attorney drafted it, Agrawal testified that the Operating Agreement was "a joint effort between me and Hammady supported by a lawyer [who had worked for AHC in the past]" and that both he and Hammady participated in deciding what they wanted in

15

the agreement. Because the ambiguity cannot be resolved by applying the applicable rules of contract construction and the intent of the parties remains unclear, the trial court's order granting summary judgment to Appellees must be reversed so that a jury can resolve these issues.

3. Appellants next contend that the trial court erred by denying their motion for summary judgment on their claim of defamation per se based on the email Agrawal sent to Cirracore informing them that Hammady was under investigation for theft. We find no error.

There are four elements to this claim: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." (Punctuation omitted.) *Mathis v. Cannon*, 276 Ga. 16, 20-21 (2) (573 SE2d 376) (2002). The record shows that Agrawal sent the email to Cirracore on August 6, 2013, which was just five days after the he went to police and reported Hammady missing, and the notation "FURTHER INVESTIGATION" appears beside the line for "Case Status/Disposition" at the top of the police report prepared at that time. Although it appears undisputed that no further investigation was conducted, genuine issues of

16

material fact exist as to whether the statement was a false and unprivileged communication and what special harm Hammady suffered or the actionability of the statement irrespective of special harm. Accordingly, summary judgment was properly denied on this claim.

4. Appellants next contend that they are entitled to summary judgment on Appellees' claim for misappropriation of trade secrets, OCGA § 10-1-760 et. seq.

Misappropriation of a trade secret occurs when a trade secret is acquired by improper means. OCGA § 10-1-761 (2) (b). "Improper means" is defined in OCGA § 10-1-761 (1) to include "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use[.]"

Although Appellants contend that there is no evidence that they improperly acquired the EMR software since it was provided to them voluntarily as part of the EMR ONC compliance project, the gist of Appellees' claim is that Appellants improperly retained and failed to return the software.[12] Although Appellants had not,

---

[12] We note that on appeal neither side addresses Paragraph 7 of the Operating Agreement, which provides in pertinent part: "The parties acknowledge and agree that the ownership of the EMR product produced by Panacea Medical MBA, LLC shall remain with Panacea MBA, LLC and that the development of the EMR software shall not affect this ownership."

17

as of the date of the summary judgment hearing, returned the EMR software, Appellants contend that they were not required to return the software and that there is no evidence that they have improperly disclosed or used the software. This was sufficient to create a genuine issue of material fact concerning whether Appellants employed improper means in retaining Appellees' software and source codes, and the trial court's denial of summary judgment on this claim is affirmed.

5. Appellants argue that they were also entitled to summary judgment on Appellees' promissory estoppel claim. As codified at OCGA § 13-3-44,

> [t]he essential elements of a claim for promissory estoppel are:
>
> (1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right.

(Citation omitted.) *Reynolds v. CB&T*, 2017 Ga. App. LEXIS 426, *12 (3) (September 22, 2017).

The gist of Appellees' promissory estoppel claim is that AHC, on behalf of Panacea Medical, invested almost $900,000 in HPN, and that at least part of this

money was expended in reliance on Appellants' promises to improve the EMR software and make it ONC compliant, which they failed to do. Citing *First Bank of Ga. v. Robertson Grading, Inc.*, 328 Ga. App. 236, 242 (1) (761 SE2d 628) (2014), Appellants argue that this claim should fail as a matter of law because Panacea Medical was required by the Operating Agreement to make cash or other contributions to support the joint venture, a fact which renders it impossible for Appellees to establish the essential element of reasonable, exclusive reliance upon any statements made by Appellants about the completion of the software. However, the Operating Agreement did not specify a specific amount that Panacea Medical was required to contribute to the joint venture, and Appellees presented at least some evidence that they continued to make monetary contributions to HPN based on the assurances Appellants made that they were nearing completion of the development of the ONC-compliant EMR software. "Questions of reasonable reliance are usually for the jury to resolve[,]" *Reynolds*, 207 Ga. App. LEXIS 42 at *12 (3), and we agree that a jury should resolve the issue of reasonable reliance under the facts of this case.

6. Healthy-IT enumerates as error the denial of its motion for summary judgment on Appellees' claim for tortious interference with contract. This claim was based on letters sent by Appellants to TelePax/PaxBox licensees notifying them that

HPN no longer had the legal right to sell, license, support, and maintain PaxBox/TelePax in the United States,[13] and "authorizing" Healthy-IT to act on their behalf to in essence terminate the contract with HPN and "resume" the contract with Healthy-IT under the terms of the previous contract. It appears undisputed that each of the licensees terminated their contracts with HPN following receipt of these letters, although not all of the licensees transferred their contracts to Healthy-IT.

"Parties to a contract have a property right therein with which a third party cannot interfere without legal justification or privilege, and a party injured by another's wrongful interference may seek compensation in tort." *Atlanta Market Center Mgmt. Co. v. McLane*, 269 Ga. 604, 608 (2) (503 SE2d 278) (1998). To recover for tortious interference with contract, "a plaintiff must establish that the defendant: '(1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with (the plaintiff); and (4) caused (the plaintiff) financial injury.'" *Cox v. City of Atlanta*, 266 Ga. App. 329, 332 (1) (596 SE2d 785) (2004). To establish that the tortfeasor acted *without* privilege, a plaintiff must show

_____

[13] It is undisputed that under the terms of the Operating Agreement, HPN was given the exclusive rights to sell and market the TelePax system in the U.S.

20

that the alleged tortfeasor is a third party or a stranger to the contract or business relation at issue. *McLane*, 269 Ga. at 608 (2); *Mabra v. SF, Inc.*, 316 Ga. App. 62 (728 SE2d 737) (2012). Further,

> [i]f the defendant in a tortious interference action has a legitimate economic interest in either the contract or a party to the contract, then that defendant cannot be considered a stranger to the contract. [Thus], where a defendant has a financial interest in one of the parties to the contract or in the contract, the defendant is not a stranger to the contract or business relationship, even though it is not a signatory to the contract.

(Citation and punctuation omitted.) *The Hammer Corp. v. Wade*, 278 Ga. App. 214, 218 (2) (628 SE2d 638) (2006). See also *McLane*, 269 Ga. at 608 (exclusion of third party beneficiaries from the stranger doctrine has been expanded to cover those who benefit from the contract of others); *Mabra*, 316 Ga. App. at 65 ("Those who have a direct economic interest in or would benefit from a contract with which they are alleged to have interfered (even though not intended third-party beneficiaries of the contract) are not strangers to the contract[.]"); *Disaster Svcs., Inc. v. ERC Partnership*, 228 Ga. App. 739, 741 (492 SE2d 526) (1997) (even if not a third-party beneficiary under Georgia law, one with a direct economic interest in a contract is not a stranger to the contract).

21

The trial court denied summary judgment to Healthy-IT on this claim because Healthy-IT was not a party to the licensing agreements between HPN and the various licensees.[14] But, as an LLC member holding a 50 percent interest in HPN, Healthy-IT clearly stood to benefit from and had an economic interest in any revenue-producing contracts or potentially revenue-producing business relationships entered into by the LLC. For example, in *ULQ, LLC v. Meder*, 293 Ga. App. 176, 183-84 (6) (666 SE2d 713) (2008), we concluded that because the alleged tortfeasor was a ten-percent owner in the LLC at the time he interfered, he could not have a been a stranger to the business relationship that he at least temporarily thwarted, causing a loss of revenue to the LLC. At the time that Healthy-IT sent the letters to HPN's licensees, HPN had not been dissolved, and Healthy-IT was still a member of the LLC with a 50 percent interest in the HPN. Accordingly, the trial court erred in denying summary judgment to Healthy-It on Appellees' tortious interference claim.[15]

---

[14] The trial court granted summary judgment to Hammady on this claim because he was a party to the licensee agreements as a manager of HPN and to Healthy-IT Egypt based on the apparent concession of Appellees that Heathy-IT Egypt had a business "role" in the contract.

[15] Although Appellees urge that Heathy-IT's argument ignores that it "went the additional step of transferring HPN's contracts to itself[,]" Appellees do not explain how this alters the stranger doctrine analysis.

7. Appellants also enumerate as error the denial of summary judgment on Appellees' claim for breach of fiduciary duty. However, they have failed to support this enumeration by either argument or citation of authority. Accordingly, it is deemed abandoned. *Befekadu v. Addis Intl. Money Transfer, LLC*, 339 Ga. App. 806, 810 (2) (795 SE2d 76) (2016); Court of Appeals Rule 25 (c) (2).

*Judgment affirmed in part and reversed in part. Barnes, P. J., and Mercier, J., concur*.