**FOURTH DIVISION**
**RICKMAN, C. J.,**
**DILLARD, P. J., and PIPKIN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 21, 2023**

# In the Court of Appeals of Georgia

A23A0489. EMILE BLAU v. STACIA HORN BLAU.

DILLARD, Presiding Judge.

Following a 25-year marriage, Emile Blau and Stacia Horn Blau divorced. In a settlement agreement incorporated into their divorce decree, Emile agreed to maintain a life-insurance policy naming Stacia as a beneficiary. After Stacia remarried, Emile filed a petition for declaratory judgment, arguing that his obligation to maintain the policy constituted alimony and, thus, terminated upon Stacia's remarriage. The trial court agreed that payment of the insurance premiums amounted to alimony, but after an evidentiary hearing, it ultimately ruled that the doctrine of promissory estoppel prevented Emile from allowing the policy to lapse. Now, in this discretionary appeal, Emile contends the trial court erred in (1) ordering him to maintain the policy despite Stacia's remarriage; (2) ruling that he was estopped from

allowing the policy to lapse; and (3) finding that a mutual mistake of law required him to maintain the policy. For the following reasons, we reverse.

In reviewing a bench trial, we will not set aside the trial court's factual findings "unless they are clearly erroneous, and this Court properly gives due deference to the opportunity of the trial court to judge the credibility of the witnesses."[1] But importantly, when a question of law is at issue, we "review the trial court's decision *de novo*."[2]

So viewed, the record shows that Emile and Stacia married in 1990. In January 2002, when Emile was 41 years old, Prudential Life Insurance Company issued him a $500,000 term-life insurance policy. The policy had a term of 54 years and the premiums remained level for the first 20 years, but were set to increase every year after that. Until January 2022, the policy premiums were $107.65 per month; but after that time, premiums increased dramatically each year. Specifically, beginning in

---

[1] *Patel v. Patel*, 285 Ga. 391, 391 (1) (a) (677 SE2d 114) (2009) (punctuation omitted); *see Gibson v. Gibson*, 301 Ga. 622, 624 (801 SE2d 40) (2017) ("In reviewing a bench trial, we view the evidence in the light most favorable to the trial court's rulings, defer to the trial court's credibility judgments, and will not set aside the trial court's factual findings unless they are clearly erroneous.").

[2] *Spruell v. Spruell*, 356 Ga. App. 722, 724 (848 SE2d 896) (2020); *see Blalock v. Cartwright*, 300 Ga. 884, 885 (I) (799 SE2d 225) (2017) (explaining that review of the trial court's determination on a question of law is *de novo*).

2022, the monthly premium of the policy increased to over $1,000 per month. And by 2043, the policy's premium will exceed $10,000 per month and rise by approximately $1,000 per month each year thereafter.

In April 2014, Emile informed Stacia that he wanted a divorce. And after months of discussions, on August 13, 2015, they executed a settlement agreement that detailed the division of marital assets. Notably, the agreement provided that each party waived their respective rights to receive alimony from the other party. The agreement also provided, in relevant part, that Emile would retain Stacia as the "irrevocable beneficiary" of the Prudential Life policy and pay all premiums "as they become due." Additionally, the agreement required Emile to "provide proof to [Stacia] on an annual basis that [the policy] is in full force and effect with her designated as the irrevocable beneficiary." The settlement agreement was then incorporated into the final judgment and decree of divorce, which was issued on December 10, 2015.

Stacia remarried in 2020. The next year (in January 2021), Emile filed a complaint for declaratory judgment, seeking a ruling that his premium payments for the policy constituted periodic alimony that terminated upon Stacia's remarriage; and thus, he was no longer obligated to pay those premiums. Stacia filed an answer and

3

moved to dismiss the complaint, arguing that given the plain language of the parties' settlement agreement—which provided that neither was to receive alimony—Emile could not state a claim as a matter of law. Nonetheless, she subsequently amended her answer, asserting that the doctrine of promissory estoppel barred the relief Emile sought in his declaratory-judgment complaint. But not long after that, the trial court denied Stacia's motion to dismiss, finding that payment of the insurance premiums constituted periodic alimony. Additionally, in its order, the trial court noted that it was not addressing Stacia's promissory estoppel argument at that time.

Further briefing ensued, and on June 30, 2022, the trial court conducted an evidentiary hearing, during which Stacia indicated that she relied upon the policy to her detriment. Specifically, Stacia testified that she would not have remarried had she known that doing so would result in allowing Emile to let the policy lapse. At the conclusion of the hearing, the trial court reiterated its ruling that the payment of insurance premiums by Emile constituted periodic alimony but took the promissory estoppel issue under advisement. A few weeks later, the trial court entered an order denying Emile's request for a declaratory judgment, holding that—although the premiums amounted to alimony—the doctrine of promissory estoppel barred Emile from discontinuing the policy. The trial court also found that the parties

4

"acknowledge[d] a mutual mistake of law" because they did not intend for the policy to be considered alimony. Emile subsequently filed an application for discretionary appeal, which we granted. This appeal follows.

1. In three separate enumerations of error, Emile contends the trial court erred in ruling that, even though the policy premiums constituted periodic alimony, the doctrine of promissory estoppel—as codified in both subsections (a) and (b) of OCGA § 13-3-44—barred him from discontinuing the policy after Stacia's remarriage. But because these issues are inextricably linked, we address them together. In doing so, we agree the trial court erred, and so we reverse its judgment.

As an initial matter, we address the trial court's ruling—in both its denial of Stacia's motion to dismiss and final order—that Emile's payment of the policy premiums constituted periodic alimony. Our analysis begins with OCGA § 19-6-1 (a), which provides that "[a]limony is an allowance out of one party's estate, made for the support of the other party when living separately," and it is "either temporary or permanent." And "periodic alimony" is characterized by "an indefinite number of payments, making the actual amount to be paid also indefinite."[3] Importantly, within

---

[3] *White v. Howard*, 295 Ga. 210, 211 (2) (758 SE2d 824) (2014); *see Metzler v. Metzler*, 267 Ga. 892, 893 (2) (485 SE2d 459) (1997) (explaining that "[a]n obligation is considered to be periodic, rather than lump sum, alimony if it states the

5

this context, the Supreme Court of Georgia addressed the exact issue before us in

*White v. Howard*[4]—a divorce case in which a wife argued that her husband's

obligation to maintain term life insurance for her benefit for 12 years was a form of

property division not subject to modification.[5] And in rejecting this argument, the

*White* Court reiterated earlier holdings that "the obligation of one spouse to carry life

insurance for the benefit of the other spouse is a form of periodic alimony,"[6] and that

---

number and amount of payments and also contains 'other limitations, conditions or statements of intent' characteristic of periodic alimony" (punctuation omitted)).

[4] 295 Ga. 210 (758 SE2d 824) (2014).

[5] *Id*. at 213 (2).

[6] *White*, 295 Ga. at 213 (2); *see Hawkins v. Hawkins*, 268 Ga. 637, 638 (491 SE2d 806) (1997) (holding that husband's obligation to pay premiums on a life insurance policy for five years, with wife as the beneficiary, was periodic alimony); *Sapp v. Sapp*, 259 Ga. 238, 240 (4) (378 SE2d 674) (1989) (explaining that, because "the number of life-insurance premium payments and the total amount of the payments are contingent on the length of the husband's life, and therefore cannot be determined at present the obligation to pay the premiums constitutes periodic alimony rather than equitable property division" (punctuation omitted)). *Cf. Moore v. Moore*, 286 Ga. 505, 506 (1) (690 SE2d 166) (2010) (holding that installment payments of a fixed amount for a fixed time period, not terminating upon the payee spouse's death, are property division rather than alimony).

6

as permanent periodic alimony, "Husband's life insurance obligation terminated upon Wife's remarriage[.]"[7] So too here.

Moreover, it is of no consequence that the settlement agreement did not characterize the policy as a form of alimony or that the agreement explicitly provided neither party would receive alimony. As our Supreme Court has explained, in reviewing awards in divorce judgments, Georgia's appellate courts will "ascertain the nature of the awards as a matter of law, and on the basis of substance rather than of labels."[8] Indeed, neither the parties nor the trial court's "characterization of an award is controlling."[9] Rather, because the *cost* to Emile and *value* to Stacia of the settlement agreement's requirement for Emile to continue paying policy premiums until 2043 were indefinite at the time of the agreement—as the amount of that award

---

[7] *White*, 295 Ga. at 213 (2); *see* OCGA § 19-6-5 (b) ("All obligations for permanent alimony, however created, the time for performance of which has not arrived, shall terminate upon remarriage of the party to whom the obligations are owed unless otherwise provided.").

[8] *White*, 295 Ga. at 213 (2) (punctuation omitted); *accord Rivera v. Rivera*, 283 Ga. 547, 548 (661 SE2d 541) (2008).

[9] *White*, 295 Ga. at 213 (2); *see Rivera*, 283 Ga. at 548 (holding the jury's identification of the award as "periodic" alimony did not control determination as to whether award was periodic or lump sum).

depends on how long Emile will live (*i.e.*, nothing or the designated policy amount)—the award was periodic alimony as a matter of law.[10]

Despite correctly determining that Emile's payment of the policy premiums constituted periodic alimony,[11] the trial court relied on the doctrine of promissory

---

[10] *See White*, 295 Ga. at 213 (2) (holding that requirement in divorce decree that husband maintain life insurance policy with wife as beneficiary for period of twelve years was award of periodic alimony—despite decree providing that neither party would pay alimony—because cost to husband and value to wife of the requirement that he maintain life insurance for her benefit for 12 years were indefinite when the decree was entered, as the amount of that award would necessarily depend on how long the husband would live); *Sapp*, 259 Ga. at 240 (4) (holding that because the number of life-insurance premium payments and the total amount of the payments are contingent on the length of the husband's life, the premiums constituted periodic alimony to wife despite trial court's intent to award same as an equitable property division).

[11] In her appellee's brief, Stacia asserts Emile's premium payments are not alimony, claiming *White*, *see supra* note 3, is distinguishable because it involved an order for the husband to *obtain* an insurance policy after the divorce rather than maintain one already purchased—as Emile initially was required to do here. But Stacia failed to file a cross-appeal of this aspect of the trial court's ruling and, thus, arguably waived any to challenge it. *See Ga. Society of Plastic Surgeons v. Anderson*, 257 Ga. 710, 711 (1) (363 SE2d 140) (1987) (holding that, as a general rule, appellee must file cross-appeal to preserve enumerations of error concerning adverse rulings); *see also* OCGA § 5-6-38. In any event, we find Stacia's attempt to distinguish *White* unpersuasive, as the salient factor in *White* was also that the payments were deemed alimony because they were indefinite in nature given that they necessarily depended on which party outlived the other. *See White*, 295 Ga. at 213 (2).

8

estoppel to find that Emile's obligation to maintain the policy survived Stacia's remarriage. In doing so, the trial court erred.

Turning to that issue, a claim for promissory estoppel "allows enforcement of promises that would otherwise be defeated by the statute of frauds."[12] In that regard, OCGA § 13-3-44 (a) provides: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of a promisee or third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Consequently, to prevail on a claim of promissory estoppel, the party asserting that claim must show:

> (1) [one party] made a promise or promises; (2) the [first party] should have reasonably expected the [other party] to rely on such promise; (3) the [other party] relied on such promise to [his or her] detriment; and (4) injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, [the other party] changed [his or her] position to [his or her] detriment by surrendering, forgoing, or rendering a valuable right.[13]

---

[12] *First Bank of Ga. v. Robertson Grading, Inc.*, 328 Ga. App. 236, 240 (1) (761 SE2d 628) (2014) (punctuation omitted).

[13] *Healthy-IT, LLC v. Agrawal*, 343 Ga. App. 660, 669 (5) (808 SE2d 876) (2017) (punctuation omitted); *accord Reynolds v. CB&T*, 342 Ga. App. 866, 872 (3) (805 SE2d 472) (2017).

Furthermore, because promissory estoppel is an equitable doctrine, the third requirement is "one of *reasonable* reliance[.]"[14] This means the plaintiff "relied exclusively on such promise and not on his or her own preconceived intent or knowledge; that the plaintiff exercised due diligence, so as to justify such reliance as a matter of equity; and that there was nothing under the circumstances which would prevent the plaintiff from relying to his detriment."[15]

Here, in its final order, the trial court found that promissory estoppel barred Emile from discontinuing the policy because Stacia relied on his promises to continue paying the premiums to her detriment. In doing so, the trial court apparently credited Stacia's testimony that she would not have remarried or agreed to waive any rights she might otherwise have to inherit from her then-current husband if she realized the insurance premiums were considered as alimony, as she believed the anticipated proceeds from the policy would provide her with any additional financial security she

---

[14] *Robertson Grading, Inc.*, 328 Ga. App. at 242 (1) (punctuation omitted); *see Ambrose v. Sheppard*, 241 Ga. App. 835, 837 (528 SE2d 282) (2000) ("[P]romissory estoppel requires only that the reliance by the injured party be reasonable." (emphasis and punctuation omitted)).

[15] *Robertson Grading, Inc.*, 328 Ga. App. at 242 (1) (punctuation omitted); *accord DPLM, Ltd. v. J.H. Harvey, Co.*, 241 Ga. App. 219, 221-22 (1) (526 SE2d 409) (1999).

10

might need. But setting aside whether Stacia's assumption that she would outlive Emile could possibly support a claim of reasonable reliance, the trial court's ruling misapplied promissory estoppel.

Generally, the theory of promissory estoppel applies only in those cases when (1) no written agreement exists,[16] (2) the written agreement is unenforceable for some reason,[17] or (3) there was a promise that post-dated the written agreement.[18] In short, the principle of promissory estoppel "merely provides that, in certain circumstances, the reliance by the promisee or third party upon the promise of another is sufficient consideration, in and of itself, to render [an] executory promise enforceable against the promisor."[19] But in stark contrast, here, the promises Emile and Stacia exchanged

---

[16] *See DPLM, Ltd.*, 241 Ga. App. at 220 (1) (explaining "the doctrine of promissory estoppel can provide a basis for enforcing a promise even in the absence of a binding contract").

[17] *See Hendon Props., LLC v. Cinema Dev., LLC*, 275 Ga. App. 434, 439 (2) (a) (620 SE2d 644) (2005) (explaining "the theory of promissory estoppel may lie even though the promise was made in a contract that is not legally enforceable").

[18] *See Sun-Pacific Enters. v. Girardot*, 251 Ga. App. 101, 105 (1) (553 SE2d 638) (2001) (holding that an oral promise, made after the parties entered into a written contract but which did not contradict that contract, could support a claim for promissory estoppel).

[19] *Loy's Office Supplies v. Steelcase, Inc.*, 174 Ga. App. 701, 702 (331 SE2d 75) (1985).

in the *written settlement agreement*—including the promise concerning the maintenance of the policy—were bargained for consideration. And importantly, when parties enter into a contract, "the consideration of which was a mutual exchange of promises[,] [t]he promises exchanged were bargained for[,] [and so] [p]romissory estoppel is not present."[20] Put more simply, when parties enter into a contract with "bargained for consideration, the terms of which include the promises alleged in support of a promissory estoppel claim, promissory estoppel is not available as a remedy."[21] Given these circumstances, the trial court erred in ruling that promissory estoppel—as codified in OCGA § 13-3-44 (a)—barred Emile from discontinuing the policy.[22]

---

[20] *Bank of Dade v. Reeves*, 257 Ga. 51, 52 (3) (354 SE2d 131) (1987).

[21] *Am. Casual Dining, L.P. v. Moe's Southwest Grill, L.L.C.*, 426 FSupp2d 1356, 1371 (III) (F) (N.D. Ga. 2006); *see Adkins v. Cagle Foods JV, LLC*, 411 F3d 1320, 1326 (4) (11th Cir. 2005) (holding that under Georgia law, when "a [party] seeks to enforce an underlying contract which is reduced to writing, promissory estoppel is not available as a remedy," relying upon *Reeves*, *supra* note 18).

[22] *See Reeves*, 257 Ga. at 53 (3) (holding that when the parties had a valid written contract, one party could not rely on the doctrine of promissory estoppel to prevent enforcement of that contract); *Adkins*, 411 F3d at 1326 (4) (same); *Am. Casual Dining, L.P.*, 426 FSupp2d at 1371 (III) (F) (holding that appellant's promissory estoppel claim failed because written contract between the parties included the terms pertaining to that promissory estoppel claim).

The trial court also determined—with little analysis—that the plain language of OCGA § 13-3-44 (b) supported Stacia's promissory estoppel claim. But setting aside the inapplicability of promissory estoppel due to the written exchange of mutual promises detailed in the parties' settlement agreement, this additional determination misconstrues the statute. OCGA § 13-3-44 (b) provides as follows: "A charitable subscription or a marriage settlement is binding under subsection (a) of this Code section without proof that the promise induced action or forbearance." And in ruling that subsection (b) applies here, the trial court essentially assumed the statute's term "marriage settlement" is synonymous with the "settlement agreement" typically incorporated into a divorce decree. But that assumption is incorrect. The statutory language contained in OCGA § 13-3-44 appears to have been adopted from the identical language found in the Restatement (Second) of Contracts Section 90.[23] And the comments and illustrations accompanying Section 90 indicate that the marriage settlements to which the section refers are archaic agreements entered into *in*

---

[23] *See* Restatement (Second) of Contracts, § 90 (1981) ("(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires. (2) A charitable subscription or a marriage settlement is binding under Subsection (1) without proof that the promise induced action or forbearance.").

13

*anticipation of or at the time of marriage* and are therefore distinct from settlement agreements executed in anticipation of divorce.[24] Furthermore, Georgia caselaw discussing the term similarly refers to it in the context of an agreement entered into in anticipation of or at the time of marriage, rather than an agreement made to dissolve one.[25] Accordingly, the trial court misconstrued the meaning of the term

[24] *See* Restatement (Second) of Contracts, § 90 (1981), comment (f) ("Subsection (2) identifies two other classes of cases in which the promisee's claim is similarly reinforced. American courts have traditionally favored charitable subscriptions and marriage settlements, and have found consideration in many cases where the element of exchange was doubtful or nonexistent."); Restatement (Second) of Contracts, § 90 (1981), comment (f), illustration (18) ("A and B are engaged to be married. In anticipation of the marriage A and his father C enter into a formal written agreement by which C promises to leave certain property to A by will. A's subsequent marriage to B is sufficient reliance to make the promise binding on C and his estate.") *see also* Overview of "Marriage Settlement," Oxford Reference https://www.oxfordreference.com/display/10.1093/oi/authority.201108031001359 81;jsessionid=D11A1C569EFEAC36F73BB9036E8207AE ("A settlement made between the parties to a marriage. A settlement made before the marriage ceremony is called an antenuptial settlement; that made after the marriage is a postnuptial settlement. The purpose of a marriage settlement is to provide an income for one spouse or the children, while securing the capital for the other spouse.") (last visited June 12, 2023).

[25] *See Trammell v. Inman*, 115 Ga. 874, 875 (1), (2) (42 SE 246) (1902) (holding that children of appellant could not claim title to certain property under a marriage settlement entered into between their mother and father because deed to property, which was conveyed to trustee of appellant's marital property, did not specifically reference marriage settlement); *Gefken v. Graef*, 77 Ga. 340, 342-43(1886) (holding that court in equity had jurisdiction over case in which husband and wife entered into a marriage settlement, by which property belonging to her was

14

"marriage settlement" under OCGA § 13-3-44 (b) in finding that promissory estoppel was also applicable under that subsection.

2. Emile further contends the trial court erred in *sua sponte* finding that a mutual mistake of law required him to maintain the policy. Again, we agree.

OCGA § 23-2-22 provides as follows: "An honest mistake of the law as to the effect of an instrument on the part of both contracting parties, when the mistake operates as a gross injustice to one and gives an unconscionable advantage to the other, may be relieved in equity." And under Georgia law, a trial court can "reform a divorce decree based on mutual mistake in those limited instances where both parties agree completely as to what their intent was and that the settlement agreement

---

conveyed to a trustee for the joint use of herself and husband and such children as she might have, but which wife subsequently sought to set aside on the ground that she and her husband incorrectly believed such a deed was necessary to prevent the husband's marital rights from attaching to property); *Rogers v. Cunningham*, 51 Ga. 40, 46 (1874) (finding marriage settlement executed between wife and husband, by which a vested remainder interest in the wife was conveyed to trustees for the purpose of protecting it from the marital rights of her husband, resulted in wife holding property in the same manner as she did before her marriage after husband died), *criticized in DeVaughn v. McLeroy*, 82 Ga. 687, 707-09 (1889); *McBride v. Greenwood*, 11 Ga. 379, 400-01 (1852) (explaining if, by marriage settlement, property is vested in trustees for the benefit of the husband and wife, and subsequently an absolute divorce is granted to the husband, the wife may, after the divorce, transfer all her rights and interests, under the marriage settlement, to her former husband).

15

incorporated into the decree failed to reflect that intent."[26] But OCGA § 23-2-21 (c) advises that "[t]he power to relieve mistakes shall be exercised with caution; to justify it, the evidence shall be clear, unequivocal, and decisive as to the mistake."[27]

In this case, in its final order, the trial court noted that "the parties acknowledge a mutual mistake of law. Clearly, per the settlement agreement, they did not intend the policy to be considered as alimony." Presumably, the trial court bases this assertion on the section in the settlement agreement waiving the parties' right to alimony and Stacia's testimony that Emile told her that he did not intend to pay alimony; but its order does not explicitly cite to any of this allegedly supporting evidence. Nevertheless, setting aside the fact that this issue was never raised—much less briefed—by either party below (and thus raises skepticism as to whether evidence of such was "clear, unequivocal, and decisive"),[28] we do not agree "the mistake operates as a gross injustice to one and gives an unconscionable advantage to the

---

[26] *Douglas v. Cook*, 266 Ga. 644, 645 (2) (469 SE2d 656) (1996); *see CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp.*, 283 Ga. 426, 427 (659 SE2d 359) (2008) ("Where reformation is sought on the ground of mutual mistake, it must, of course, be proved to be the mistake of both parties." (punctuation omitted)).

[27] *Accord CS-Lakeview at Gwinnett, Inc.*, 283 Ga. at 429; *Zaimis v. Sharis*, 275 Ga. 532, 533 (1) (570 SE2d 313) (2002).

[28] *See* OCGA § 23-2-21 (c).

16

other."[29] Indeed, Stacia would only benefit from the policy if she outlived Emile—which is an entirely speculative outcome.[30] Accordingly, the trial court erred in ruling that such speculation warrants equitable intervention in this matter.

For all these reasons, we reverse the trial court's ruling denying Emile's declaratory judgment action.

*Judgment reversed. Rickman, C. J., and Pipkin J., concur*.

---

[29] *See* OCGA § 23-2-22.

[30] *See Extremity Healthcare, Inc. v. Access to Care Am., LLC*, 339 Ga. App. 246, 257 (2) (793 SE2d 529) (2016) (holding that doctrine of mutual mistake did not apply to render buyout agreement, in which members of failed joint venture to operate surgical center agreed to buy out interest of withdrawing members, invalid, even if parties mistakenly believed at time of contracting that center's lease was valid given that buyout agreement reflected parties' consideration of possibility that lease might have to be amended before it could be assigned and that assignment might never occur).