BARNES, Judge.
 

 These three appeals involve the construction of a merchandise license agreement. Marvel Enterprises, Inc., appeals the trial court's grant of summary judgment to World Wrestling Federation Entertainment, Inc. ("WWE") and its wholly-owned subsidiary, WCW, Inc. ("New WCW"). Marvel also appeals the grant of partial summary judgment to Universal Wrestling Corporation, formerly known as World Championship Wrestling, Inc. ("Old WCW") on its third-party beneficiary claim, and appeals the trial court's ruling that the parties' agreement was not ambiguous and thus could not be construed through parol evidence. Finally, Old WCW appeals the trial court's partial denial of its motion for summary judgment on the remainder of Marvel's claims against it. For the reasons that follow, we affirm the trial court in Case Nos. A04A1897 and A04A1898, and reverse in Case No. A04A1899.
 

 Understanding the relationships between the business entities is essential to resolving the issues in this case, although the multiple three-letter acronyms can be confusing. Marvel, formerly known as Toy Biz, contracted with World Championship Wrestling, Inc. (Old WCW), to license certain "elements" to make action figures. Those licensed elements were listed in a schedule attached to the contract that included 116 specific characters, World Championship Wrestling programs, all future television premium channel and pay-per-view programming, and WCW logos and slogans. The schedule further provided that the licensed elements were included only to the extent of Old WCW's ownership or control, and that Old WCW reserved the right to amend the list. Finally, Schedule 1 of the licensing agreement
 

 **608
 

 provided that if Old WCW's contractual relationship with the licensed elements terminated before the end of the contract term for any reason, Marvel retained "the right to manufacture and distribute the Licensed Elements as they relate to the Authorized Articles for a period of one year or the remainder of the relationship between WCW and the wrestler; provided said time frame does not exceed the Term of this Agreement."
 

 Several years into the contract, Old WCW sold or assigned some of its assets to a wholly-owned subsidiary of WWE known as W. Acquisition Company. Those assets included most of its intellectual property rights, the merchandise licensing agreement with Marvel, 86 other merchandise licensing agreements, and 23 wrestlers' contracts. The assigned intellectual property rights included the trade name World Championship Wrestling, so after the asset purchase Old WCW changed its name to Universal Wrestling Corporation (Old WCW), and W. Acquisition Company changed its name to WCW, Inc. (New WCW). Old WCW ceased all wrestling promotions, television programming, and other related activities.
 

 According to WWE, it planned to launch a new WCW program portraying Old WCW talent under contract to New WCW, and to license that intellectual property to third parties. Critical to this plan was to obtain clearance for the new program from Viacom, Inc., with whom WWE had an exclusive contract to televise WWE programs. Viacom and WWE were unable to come to terms on programming for New WCW shows, so plans for WCW-branded programs and promotions ended. WWE took the position that, without any ongoing WCW television programming or promotions, the subject matter of its merchandise licensing agreement with Marvel no longer existed.
 

 WWE developed a storyline in its own programming that it was being "invaded" by WCW wrestlers, who were identified on the programs with the WCW logo. WWE wrestlers competed for WCW championship belts. But all of the WCW talent entered into new contracts with WWE, and by fall 2001, WWE's creative team eliminated the WCW storyline and no longer identified any of its wrestlers with WCW.
 

 *587
 
 Marvel sued WWE and New WCW for breach of contract. It also sued Old WCW separately for breach of contract, breach of the covenant of good faith and fair dealing, and as a third-party beneficiary of Old WCW's talent contracts with its wrestlers. Following discovery, all of the defendants moved for summary judgment. The trial court granted summary judgment to WWE and New WCW, and granted partial summary judgment to Old WCW on Marvel's third-party beneficiary claim. In Case No. A04A1897, Marvel appeals the grant of summary judgment to New WCW and WWE, and in Case No. A04A1898 appeals the partial grant of summary judgment to Old
 

 **609
 

 WCW. In Case No. A04A1899, Old WCW cross-appeals the trial court's denial of its motion for summary judgment on Marvel's remaining claims against it.
 

 In granting summary judgment to WWE, New WCW, and Old WCW, the trial court found that
 

 (1) The License Agreement at issue in this case is not ambiguous, and therefore it is not appropriate for parol evidence to be considered in construing the License Agreement;
 

 (2) WCW had the right to amend the list of Licensed Elements set forth in Schedule "1" of the License Agreement; [and]
 

 (3) Plaintiff Marvel Enterprises, Inc. ("Marvel") acquired no rights to any of the characters of WWE as a result of draping [or using the WCW logo to identify them].
 

 On appeal we review the trial court's grant of summary judgment de novo to determine whether the evidence, viewed in the light most favorable to the nonmoving party, demonstrates a genuine issue of material fact. Summary judgment is proper only when no issue of material fact exists and the moving party is entitled to judgment as a matter of law.
 
 Preferred Real Estate Equities v. Housing Systems,
 

 248 Ga.App. 745
 
 ,
 
 548 S.E.2d 646
 
 (2001). Further, when ruling on a motion for summary judgment, a court must give the opposing party the benefit of all reasonable doubt, and the evidence and all inferences and conclusions therefrom must be construed most favorably toward the party opposing the motion.
 
 Moore v. Goldome Credit Corp.,
 

 187 Ga.App. 594
 
 , 596,
 
 370 S.E.2d 843
 
 (1988). On motions for summary judgment, however, courts cannot resolve the facts or reconcile the issues.
 
 Fletcher v. Amax, Inc.,
 

 160 Ga.App. 692
 
 , 695,
 
 288 S.E.2d 49
 
 (1981). When reviewing the grant or denial of a motion for summary judgment, this court conducts a de novo review of the law and the evidence.
 
 Desai v. Silver Dollar City,
 

 229 Ga.App. 160
 
 , 163(1),
 
 493 S.E.2d 540
 
 (1997).
 

 Case No. A04A1897
 

 Marvel argues first that the court failed "to give meaning to the exclusivity provisions" of the agreement. WWE responds that Marvel waived this argument by failing to raise it before the trial court, and further responds that Marvel has misread and misapplied the contract's exclusivity provision.
 

 **610
 

 1. WWE argues that Marvel is precluded from raising the exclusivity issue before this court because it did not argue it before the trial court. It is true that "[i]ssues never raised at trial will not be considered for the first time on appeal. [Cit.]"
 
 Hammond v. Paul,
 

 249 Ga. 241
 
 (1),
 
 290 S.E.2d 54
 
 (1982). In this case, however, the issue of whether Marvel's exclusive right to manufacture WCW action figures continued after New WCW acquired Old WCW's assets was argued in the trial court. In its complaint, Marvel asserted that "Old WCW agreed that under no circumstances would it grant the rights granted to Marvel under the License Agreement to any third party unless Marvel failed to cure a default...." Marvel further contended that "Old WCW also agreed that it would not enter into any agreement with any third party that would conflict or be materially inconsistent with the License Agreement." In its brief in opposition to WWE's motion for summary judgment, Marvel noted on its first page that the parties signed an agreement "under which Marvel was granted the exclusive right to make and sell action figures...." Later in the brief, Marvel argued that WWE "frustrated Marvel's attempts to perform under the License Agreement. Instead, Defendants allowed
 
 *588
 
 another toy maker, Jakks, to sell toys of former WCW wrestlers...."
 

 Further, Marvel argued during the hearing on WWE's motion for summary judgment that WWE failed to use due diligence to discover before assuming this exclusive license that it conflicted with its existing exclusive license. WWE chose to honor its existing contract, did not negotiate on Marvel's contract, and chose to be sued instead, Marvel argued. Thus, the issue of whether the license agreement gave Marvel the exclusive right to manufacture certain action figures was clearly argued in the court below, and WWE's argument otherwise is not persuasive.
 

 2. To consider the merits of Marvel's enumeration regarding exclusivity, we must construe the contract before us. In this State,
 

 [t]he construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. (Cits.)
 

 Schwartz v. Harris Waste Mgmt. Group,
 

 237 Ga.App. 656
 
 , 660(2),
 

 **611
 

 516 S.E.2d 371
 
 (1999). The existence or nonexistence of an ambiguity is a question of law for the court.
 
 Southeast Atlantic Cargo Operators v. First State Ins. Co.,
 

 197 Ga.App. 371
 
 , 372,
 
 398 S.E.2d 264
 
 (1990).
 

 Marvel contends that the contract's exclusivity provision is broader than the grant of licensing rights. The grant of licensing rights limits Marvel to manufacturing "authorized articles," including action figures, of "licensed elements," which are the named characters included in Schedule 1. The exclusivity provision, on the other hand, gives Marvel the exclusive right to manufacture all of WCW's "authorized articles" without limiting the right to the licensed elements. Therefore, Marvel argues, that provision gives Marvel the exclusive right to make action figures of all WCW-branded wrestlers, even when they performed on WWE shows.
 

 To determine the merits of Marvel's claim that the contract's exclusivity provision gives it broader coverage than its licensing grant, we first consider whether the contract language is clear and unambiguous. The contract's exclusivity clause provides that the "Licensor shall not grant to another party in the [worldwide] Territory the rights covered in this Agreement for the Articles described herein...."
 

 The contract further grants to Marvel a license to use
 

 certain names, likenesses, characters, trademarks and/or copyrights in connection with the manufacture, distribution, advertising, promotion and sale of certain articles of merchandise on the following terms and conditions:
 

 1. Licensed Elements: See Schedule "1" attached below.
 

 2. Authorized Articles:
 

 Action figures and accessories ...
 

 Soft body fabric covered figures ...
 

 Playsets and wrestling rings ...
 

 Inflatables, kites, and 3D keychains.
 

 Schedule 1 defines the licensed elements as
 

 only the names and static visual likenesses of the following specific fictional character as depicted in the entertainment properties defined below as the "Programs."... It is specifically understood and agreed that the character names,
 

 **612
 

 likenesses and other elements referred to above ... are included within the definition of "Licensed Elements" (i) only to the extent of WCW's ownership or control thereof, and (ii) only as specifically depicted in and as part of the Programs.
 

 A fair reading of the contract reveals that the exclusivity provision only gives Marvel the exclusive rights "
 
 covered in this Agreement
 

 *589
 
 for the Articles described herein." (Emphasis supplied.) Those rights under the agreement are further limited by the licensed elements as described in Schedule 1. Wrestlers under contract to WWE are not subject to the license agreement because they are not described as licensed elements, and therefore WWE's exclusive license with another toy company to manufacture action figures depicting WWE wrestlers does not conflict with WCW's exclusive license with Marvel. Accordingly, the trial court did not err by holding that the contract was not ambiguous and by granting summary judgment to WWE on this ground.
 

 3. Marvel also contends that the trial court erred by holding that the agreement gave WWE the "unilateral unfettered right to change the scope of the license." It argues that the contract language, the parties' course of dealing, contemporaneous documents, and the testimony of Marvel's employee who drafted the contract show that Marvel had rights to all wrestlers who came under contract to WCW. WWE argues that any actions it took were authorized by and consistent with the license agreement.
 

 Schedule 1 of the license agreement provides that
 

 WCW and Licensee acknowledge and agree that Licensee is granted fully and to the maximum extent of rights in the Licensed Elements equal to that of the talent's grant of rights of the Licensed Elements to WCW.
 
 WCW reserves the right to amend the list
 
 of Licensed Elements from time to time to keep the list current with WCW licensing rights.
 

 (Emphasis supplied.)
 

 Schedule 1 further defines "Programs" as "WORLD CHAMPIONSHIP WRESTLING [,] NWO; and all future television premium channel and Pay-Per-View programming." Specific "Licensed Elements" include "All WCW and NWO Logos [,] All WCW and NWO Slogans," and 116 named characters, including wrestlers and announcers.
 

 Regardless of testimony by Marvel's witnesses that they intended to obtain licensing rights to all of WCW's wrestlers and expected that the roster of licensed elements would change as the
 

 **613
 

 characters changed in the wrestling scripts, the contract itself does not so provide. Instead, it gave WCW the right to amend the list from time to time to keep the list current with WCW licensing rights. From that one can only conclude that, if WCW no longer had the right to license a wrestler's image because it no longer had a contract with the wrestler, then it could amend the licensed elements to reflect that fact, which is what New WCW did when it assumed the contract. Both sides cite to parol evidence outlining the discussions regarding this provision, but as the contract itself unambiguously defines the terms, such parole evidence is unnecessary and inadmissible to construe the contract terms.
 

 As to the 23 wrestlers included in New WCW's amendment to the list of licensed elements, Marvel argues that, when any of those wrestlers began appearing on WWE programs, wearing the WCW logos, it was exclusively entitled to manufacture action figures of those wrestlers under this contract. WWE responds that Marvel's licensing rights only extended to licensed elements who appeared on WCW television shows.
 

 Schedule 1 of the license agreement defines "Programs" as "WORLD CHAMPIONSHIP WRESTLING[,] NWO; and all future television premium channel and Pay-Per-View programming." "World Championship Wrestling" and "NWO" (New World Order) referred to the two principal factions or brands depicted in WCW programming. Looking at the contract as a whole as required by OCGA § 13-2-2, the phrase "and all future television premium channel and Pay-Per-View programming" referred to all future WCW-branded television programming for which WCW held licensing rights. The contract simply does not grant licensing rights to named wrestlers who appear on programs other than WCW programs, and the trial court did not err on this ground in granting summary judgment to WWE.
 

 Case No. A04A1898
 

 4. In its appeal against Old WCW, Marvel first argues that the trial court erred
 
 *590
 
 in ruling that the agreement was not ambiguous and that parol evidence could not be used to construe it. Marvel asserts that, under the contract terms, Old WCW could not assign the license agreement to New WCW without also assigning all of its talent contracts. It derives this conclusion from language in Schedule 1 which provides that Marvel "is granted fully and to the maximum extent of rights in the Licensed Elements equal to that of the talent's grant of rights of the Licensed Elements to WCW," and argues that this language should be construed as a constraint on Old WCW's exercise of its assignment right.
 

 **614
 

 The contract, however, explicitly reserved to Old WCW the unrestricted right to assign the License Agreement to any third party. Paragraph A-18 of Exhibit A, incorporated into the agreement, provides,
 

 WCW reserves the right to assign this Agreement to any third party and to hypothecate or pledge this Agreement as collateral for any purpose. In the event of any such assignment, Licensee shall pay the royalties and Guaranties due hereunder as directed by WCW. This Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of WCW.
 

 The agreement also expressly reserved to Old WCW the right to fully and exclusively control its business and its contractual relationships with its wrestling talent, including the right to terminate any and all of the talent contracts. The agreement further provided that Old WCW's withdrawal of any licensed elements from Schedule 1 did not constitute grounds for contract termination unless all of the elements were simultaneously withdrawn. Thus Marvel's argument that the contract contains an ambiguity about Old WCW's assignment rights is meritless.
 

 5. Marvel also argues that the trial court erred in granting partial summary judgment to Old WCW on Marvel's third party beneficiary claim. It contended in its complaint that, "[p]ursuant to the License Agreement, Marvel is a third party beneficiary of Old WCW's Talent Agreements with the wrestling talent that form the basis of the Licensed Elements."
 

 OCGA § 9-2-20(b) provides that "[t]he beneficiary of a contract made between other parties for his benefit may maintain an action against the promisor on the contract."
 

 A third-party beneficiary contract is one in which the promisor engages to the promisee to render some performance to a third person. In order for a third party to have standing to enforce such a contract it must clearly appear from the contract that it was intended for his benefit. The mere fact that he would benefit from performance of the agreement is not alone sufficient.
 

 (Citations and punctuation omitted.)
 
 Tyler v. PepsiCo,
 

 198 Ga.App. 223
 
 , 227(2)(b),
 
 400 S.E.2d 673
 
 (1990).
 

 In other words, "[a] third-party beneficiary contract is one in which the promisor engages to the promisee to render some performance to a third person. It must appear that both parties to the
 

 **615
 

 contract intended that a third person should be the beneficiary." (Citations omitted.)
 
 Stewart v. Gainesville Glass Co.,
 

 131 Ga.App. 747
 
 , 753,
 
 206 S.E.2d 857
 
 (1974). A third party has standing to enforce that type of contract "if it clearly appears from the contract that it was intended for his benefit; the mere fact that he would benefit from performance of the contract is insufficient." (Citation and punctuation omitted.)
 
 Starrett v. Commercial Bank of Ga.,
 

 226 Ga.App. 598
 
 , 599(1),
 
 486 S.E.2d 923
 
 (1997). While the third-party beneficiary need not be specifically named, the question is "whether the parties' intention to benefit the third party is shown on the face of the contract."
 
 Northen v. Tobin,
 

 262 Ga.App. 339
 
 , 344(2)(b),
 
 585 S.E.2d 681
 
 (2003).
 

 The contracts to which Marvel claims it is a third-party beneficiary are the talent contracts between the wrestlers and Old WCW. Those contracts provided that the wrestler transferred and assigned any intellectual property rights in his wrestling work product, exclusively during the contract term and nonexclusively afterward. Each wrestler signed a second, related document, a merchandising agreement, that further detailed the intellectual property rights that
 
 *591
 
 the wrestler granted to Old WCW. Those rights included his stage name, likeness, voice, props, and "any and all of Wrestler's other distinctive and identifying indicia as used by or associated with Wrestler in the business of professional wrestling," to be used to design materials such as, for example, clothing, posters, toys, cards, and television rights. The rights granted were exclusive to Old WCW during the agreement, although Old WCW was not obligated to use the intellectual property, and retained the right to assign or transfer the agreement to any entity. These contracts do not reveal any intention to benefit Marvel. While they do contemplate using a manufacturer to make certain items, the intended beneficiaries are the contract parties themselves, not the company that will be producing the items on which the wrestlers and Old WCW hoped to make money.
 

 The trial court did not err in granting summary judgment to Old WCW on Marvel's claim for damages as a third-party beneficiary to Old WCW's contracts with the wrestling talent.
 

 Case No. A04A1899
 

 In its cross-appeal, Old WCW asserts that the trial court erred in denying its motion for summary judgment on Marvel's claims for breach of contract, breach of an implied covenant of good faith and fair dealing, and damages.
 

 6. Old WCW argues that it did not breach the licensing agreement by assigning it to WWE without also simultaneously assigning all of its talent contracts to New WCW, because the parties' contract
 

 **616
 

 did not obligate Old WCW to do so. Marvel argues that a factual issue exists as to whether such an obligation is found within the four corners of the contract.
 

 The record establishes that when Old WCW assigned the merchandise licensing agreement to New WCW, it had 90 to 100 current wrestling talent contracts. It gave New WCW a list of those wrestlers, and New WCW elected to assume 21 of those contracts. Most of the remaining contracts were allowed to expire subsequently, and Old WCW allowed "a handful" of wrestlers to buy out their contracts.
 

 OCGA § 13-2-2(4) provides that "[t]he construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part." As discussed in Divisions 3 and 4, supra, the contract explicitly reserved to Old WCW the unrestricted right to assign the License Agreement to any third party, and "to amend the list of Licensed Elements from time to time to keep the list current with WCW licensing rights." As also discussed in Division 4, the agreement expressly reserved to WCW the right to fully and exclusively control its business and its contractual relationships with its wrestling talent, including the right to terminate any and all of the talent contracts. Finally, Old WCW's withdrawal of any licensed elements from Schedule 1 did not constitute grounds for contract termination unless all of the elements were simultaneously withdrawn.
 

 "Georgia law does not permit us to ignore plain language in a contract or to construe it as meaningless."
 
 Myers v. Texaco Refining & Marketing,
 

 205 Ga.App. 292
 
 , 297(2),
 
 422 S.E.2d 216
 
 (1992). The contract between Marvel and Old WCW gave the wrestling company the right to do what it did, which was to terminate or allow to expire some of talent contracts of wrestlers listed as licensed elements in the merchandise licensing agreement, and to assign the agreement to New WCW along with only a portion of its talent contracts. Accordingly, the trial court erred in denying summary judgment to Old WCW on Marvel's claim for breach of contract by assigning it to New WCW without assigning all of its talent contracts too.
 

 7. Old WCW contends that the trial court erred in holding that factual issues remain as to whether the license agreement's indemnification provision afforded a separate basis for a claim against Old WCW. Paragraph A-11 of the contract provides that Old WCW will indemnify Marvel for all claims "arising solely out of the use by the Licensee of the Licensed Elements." Marvel's claims do not arise out of the use of the licensed elements; to the contrary, they arise out of
 
 *592
 
 its inability to use the licensed elements. Therefore the trial court erred in denying summary judgment to Old WCW on this ground.
 

 8. Old WCW next asserts that, because the terms of the contract allowed it to take the actions of which Marvel complains, it cannot be
 

 **617
 

 liable for breaching the implied covenant of good faith and fair dealing. Marvel responds that Old WCW's failure to assign all of its talent contracts associated with the licensing agreement, and subsequent releases of the nonassigned wrestlers, impaired its list of licensed elements and diminished its benefits under the agreement. Those issues have been decided adversely to Marvel in previous divisions, and therefore the trial court also erred in denying summary judgment to Old WCW on this ground.
 

 9. Old WCW's remaining claims are moot in light of our previous holdings.
 

 Judgments affirmed in Case Nos. A04A1897 and A04A1898. Judgment reversed in Case No. A04A1899.
 

 RUFFIN, C.J., and ADAMS, J., concur.
 

 BLACKBURN, P.J., and MIKELL, J., not participating.