**SECOND DIVISION**
**MERCIER, C. J.,**
**MILLER, P. J., and HODGES, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 25, 2023**

# In the Court of Appeals of Georgia

A23A0975. AMAC TWO, LLC et al. v. WEB, LTD.

HODGES, Judge.

Plaintiffs AMAC Two, LLC, d/b/a Two Urban Licks ("AMAC"), and its corporate affiliate CC&C, LLC (collectively, "the plaintiffs") appeal the trial court's grant of Defendant Web, Ltd.'s motion for summary judgment and the denial of their motion for partial summary judgment in this dispute over parking rights. The plaintiffs assert that the trial court erred in its construction of a lease provision concerning parking spaces and in entering summary judgment on their tortious interference and trespass claims. Because we find that the lease language is ambiguous and the parties' intent impossible for us to resolve using contract construction rules, we reverse the trial court's grant of summary judgment to Web and affirm the trial court's denial of partial summary judgment to AMAC on AMAC's

claims for declaratory judgment, specific performance, breach of contract, and anticipatory breach of contract surrounding Web's alleged failure to recognize AMAC's exclusive parking rights under the lease. However, applying established law, we affirm the trial court's grant of summary judgment to Web on AMAC's tortious interference and trespass claims.

"We review de novo a grant or denial of summary judgment, viewing the evidence and all reasonable conclusions and inferences drawn from it in the light most favorable to the nonmovant." *Henry v. Griffin Chrysler Dodge Jeep Ram*, 362 Ga. App. 459, 460 (868 SE2d 827) (2022). "Because this opinion addresses cross-motions for summary judgment, we will construe the facts in favor of the nonmoving party as appropriate." (Citation and punctuation omitted.) *Brown v. Sapp*, 351 Ga. App. 352, 352 (829 SE2d 169) (2019).

So viewed, the record shows that in 2003, AMAC and Web entered into a lease for a portion of Web's warehouse and parking spaces in the parking lot, which AMAC uses to operate its restaurant, Two Urban Licks. The lease includes clauses referencing parking spaces useable by AMAC from 5:30 p.m. until 5:00 a.m. The property where the warehouse is located is known as "Common Ground." AMAC acknowledges that the area around Common Ground has changed significantly in the

past few years, in large part because of the Atlanta Beltline and the proximity of Ponce City Market. In 2016, Web began leasing additional portions of the warehouse facility to other tenants. The leases with these tenants do not mention any exclusive evening parking rights potentially held by AMAC; instead, the lease language allows the new tenants to park in any of the spaces in the lot, at any time, on a first come, first served basis.

On September 17, 2020, the Poncey-Highland Historic District ("PHHD"), which includes Web's Common Ground property, was approved by the City of Atlanta. The parties do not dispute that Section 6 of the PHHD Ordinance provides that "[a]ll properties lying within said Poncey-Highland Historic District shall be subject to the regulations attached hereto as Attachment 'C'. . . [,]" and Attachment C reduces the minimum number of parking spaces required for nonresidential use, such as those used by Two Urban Licks, to zero.

In 2021, the plaintiffs filed suit, claiming "[Web] and its other tenants refused to recognize AMAC's exclusive evening rights." Their complaint, which was subsequently amended, alleges (1) a dispute between AMAC and Web over parking rights under the 2003 lease; (2) a dispute concerning Web's alleged interference with a 2019 valet contract AMAC had with Eagle Parking, LLC ("Eagle"); and (3) a

3

dispute regarding the enforceability of CC&C's exclusive parking rights on an adjacent United States Postal Service ("USPS") lot. Web moved for summary judgment on all claims, and AMAC moved for partial summary judgment on the claims regarding its parking rights under the lease. The trial court granted Web's motion for summary judgment and denied AMAC's motion for partial summary judgment. This appeal followed.

1. AMAC asserts that the trial court erred in granting Web's motion for summary judgment on AMAC's claims for declaratory judgment, specific performance, breach of contract, and anticipatory breach of contract surrounding Web's failure to recognize exclusive evening parking rights potentially held by AMAC under the lease. Because we find the language of the lease at issue is ambiguous and the parties' intent impossible for us to resolve using contract construction rules, we reverse the trial court's grant of Web's motion for summary judgment on these claims, but affirm the denial of AMAC's motion for partial summary judgment on these claims.

"The interpretation of a contract is a question of law, unless the contract language presents an ambiguity that cannot be resolved by the rules of construction." *Greenberg Farrow Architecture v. JMLS 1422, LLC*, 339 Ga. App. 325, 329 (1) (791

4

SE2d 635) (2016). Likewise, "[t]he existence or nonexistence of an ambiguity is a question of law for the court." *Marvel Enterprises v. World Wrestling Federation Entertainment*, 271 Ga. App. 607, 611 (2) (610 SE2d 583) (2005). "When reviewing a trial court's determination of legal issues, we consider such questions de novo and owe no deference to a trial court's legal analysis." (Citations and punctuation omitted.) *Huckaby v. Cheatham*, 272 Ga. App. 746, 749 (1) (612 SE2d 810) (2005). It is well settled that

> [c]ontract construction involves a three-step analysis by the trial court: (1) the court must decide if the contract language is unambiguous; if it is not ambiguous, the court enforces the contract's clear terms; (2) if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity; and (3) if the ambiguity remains after use of the construction rules, the meaning of the contract must be decided by a jury.

*Snipes v. Marcene P. Powell & Assocs.*, 273 Ga. App. 814, 815 (1) (a) (616 SE2d 152) (2005).

As stated, a trial court must first determine whether contractual language is unambiguous. *Snipes*, 273 Ga. App. at 815 (1) (a). "Where the terms of a written lease are clear and unambiguous, the court will look to the lease alone to find the intention of the parties." *Porter Communications Co. v SouthTrust Bank*, 268 Ga. App. 29, 32

5

(2) (601 SE2d 422) (2004). "If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." OCGA § 13-2-3. Indeed, no construction is required or permitted where contractual language is plain and unambiguous, and the terms of the contract "must be given an interpretation of ordinary significance . . . and understood in their plain, ordinary, and popular sense." (Citations and punctuation omitted.) *Race, Inc. v. Wade Leasing*, 201 Ga. App. 340, 341 (1) (411 SE2d 56) (1991).

On the other hand, if the language of a contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity. *Snipes*, 273 Ga. App. at 815 (1) (a). "The cardinal rule of construction is to ascertain the intent of the parties." (Citation omitted.) *Greenberg Farrow Architecture*, 339 Ga. App. at 329 (1). Under Georgia law, an "[a]mbiguity exists when a contract contains an uncertain meaning, is duplicitous, and indistinct, or when a word or phrase may be fairly understood in more than one way." *Snipes*, 273 Ga. App. at 816 (1) (a); accord *Greenberg Farrow Architecture*, 339 Ga. App. at 329 (1) ("An ambiguity is defined as duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and also signifies of doubtful or uncertain nature; wanting clearness or

6

definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations.") (citation omitted). In short,

> [a] contract is ambiguous if the words used therein leave the intent of the parties in question—i.e., that intent is uncertain, unclear, or is open to various interpretations. On the other hand, no ambiguity exists where, examining the contract as a whole and affording the words used therein their plain and ordinary meaning, the contract is capable of only one reasonable interpretation.

(Citations and punctuation omitted.) *Citrus Tower Boulevard Imaging Center v. David S. Owens, MD, PC*, 325 Ga. App. 1, 8 (2) (752 SE2d 74) (2013).

Applying these well established principles, we turn to the lease provisions at issue. Section 1 (h) of the lease defines "Premises" as "[t]he portion of the Building outlined on the diagram attached hereto as *Exhibit "A"*, together with the non-exclusive use of the Parking Facilities[.] . . ." Section 1 (l), in turn, defines "Parking Facilities" as follows:

> As depicted on *Exhibit "B"* (to consist of not less than the number of spaces which are required by the City of Atlanta for the issuance of a building permit, certificate of occupancy and a liquor license and not more than 87 spaces, which spaces shall be useable exclusively by Tenant from 5:30 p.m. until 5:00 a.m.)[.]

7

Exhibit B depicts 94 surface parking spaces in front of the building. Web admits, however, that there were never 94 spaces in the parking lot after AMAC's construction of Two Urban Licks because eight of the spaces were used to access the building. Under Section 2 of the lease, entitled "Lease of Premises," the lease states that ". . . [t]he Premises is comprised of the premises, and the exclusive use of the Parking Facilities (from 5:30 P.M. to 5:00 A.M.) . . . ."

The trial court adopted Web's interpretation of the lease, finding that the clear and unambiguous language in Section 1 (l) of the lease ties AMAC's exclusive evening parking rights to current City of Atlanta regulations. Specifically, the court concluded that the present tense language used in Section 1 (l) "incorporates the present City of Atlanta parking requirements to establish a minimum number of parking spaces that Web, as the landlord, had to provide to AMAC, as the tenant." According to the trial court, the parenthetical language in that section defines the upper and lower bounds of the number of parking lot spaces AMAC has leased, and AMAC therefore is not entitled to any exclusive parking spaces since the current minimum number required under the PHHD Ordinance for nonresidential use is zero. The court further found that the lease language "did not obligate Web to provide exclusive parking rights to eighty-seven (87) spaces to AMAC."

8

AMAC does not dispute that the 2020 PHHD Ordinance eliminates minimum parking requirements for nonresidential use, and, in fact, does not dispute that, under the Ordinance, Web could reconfigure its parking lot to add green spaces, potentially reducing the number of parking spaces in the lot to zero. AMAC, however, argues that Section 1 (l) of the lease clearly and unambiguously "defines the size of the lot in terms of the number of spaces that comprise the lot." According to Web, the City of Atlanta regulation language "describes the minimum number of spaces that comprise the parking lot depicted on Exhibit B[.]" AMAC further maintains that the trial court's interpretation ignores Section 2 of the lease, which grants AMAC exclusive evening parking rights from 5:30 p.m. to 5:00 a.m., and its interpretation renders the word "exclusive" meaningless. Simply put, AMAC maintains that the 2020 City Ordinance "only affects the minimum configuration of a parking lot rather than eliminates exclusive evening rights[,]" and, as long as Web maintains the parking lot, AMAC is guaranteed under the lease at least 87 of those spaces from 5:30 p.m. until 5:00 a.m.

We disagree with the parties' characterizations of the lease language as clear and unambiguous. In fact, the parties cannot even agree on the purpose of Section 1 (l): Web argues it defines the exclusive evening parking spaces it had to provide to

9

AMAC, and AMAC argues it defines the parking lot size. Indeed, there are issues with both parties' interpretations, and the lease provisions themselves are internally inconsistent. For example:

- Section 1 (h) defines the "Premises" as the building and "the non-exclusive use of the Parking Facilities";

- Section 1 (l) defines the "Parking Facilities" "[a]s depicted on *Exhibit B*," which includes 94 spaces, but then includes an extremely poorly written parenthetical over which the parties present conflicting interpretations, using as a moving target "the number of spaces which are required by the City of Atlanta for the issuance of a building permit, certificate of occupancy and a liquor license" with AMAC potentially entitled to some number of exclusive spaces from 5:30 p.m. to 5:00 a.m.; and

- Section 2 details the "Lease of Premises" by stating, "The Premises is comprised of the Premises, and the exclusive use of the Parking Facilities (from 5:30 P.M. to 5:00 A.M.) . . ." with no contingency or restriction on these exclusive evening spaces.

The trial court's order does not mention the language used in Section 2 of the lease, neither does it reconcile or harmonize the language used in Section 1's definitions with the non-contingent language used in Section 2.

In addition, although the trial court places great weight on the use of the present tense in Section 1 (l), concluding that the present tense language in that section necessarily "incorporat[es] the present requirements of the City of Atlanta to establish a minimum number of required parking spaces" "that Web, as the landlord, had to provide to AMAC, as the tenant[,]" the court ignores the many places in the lease that use future tense language. For example, in Section 1 (h) the lease notes that "[t]he precise square footage of the portion of the Building" being leased by AMAC "will be determined . . . after the demising walls have been constructed by [AMAC,]" and in Section 13 AMAC agrees that it "will, at its expense, comply with all laws, ordinances, orders, directions, requirements, rules and regulations of all governmental authorities . . ., now in force or which may hereafter be in force . . . ." The use of the future tense in other lease provisions creates some ambiguity as to whether the parties' use of the present tense in Section 1 (l)'s definition refers to "the number of spaces which are required by the City" when the contract was entered as compared to a moveable target throughout the life of the lease. Indeed, although both parties argue that the parking provisions in the lease are clear and unambiguous, we conclude that the language is ambiguous in that it is duplicitous and may be fairly understood in more than one way. See *Snipes*, 273 Ga. App. at 816 (1) (a).

11

Finding the lease language ambiguous, we turn to the rules of contract construction in an attempt to resolve the ambiguity. As stated previously, "[t]he cardinal rule of construction is to ascertain the intent of the parties." (Citation and punctuation omitted.) *Greenberg Farrow Architecture*, 339 Ga. App. at 329 (1). In so doing, we could look to parol evidence to explain ambiguities and the parties' intent when they entered into the lease, see *Tachdjian v. Phillips*, 256 Ga. App. 166, 171 (568 SE2d 64) (2002), but neither party has pointed to any parol evidence, arguing instead that their interpretations are supported by the clear and unambiguous contractual language. We therefore have only the four corners of the lease to resolve any ambiguities and determine the parties' intent with respect to the number, if any, of exclusive evening parking spaces to which AMAC is entitled under the lease.

Under the rules of contract construction, "a court should, if possible, construe a contract so as not to render any of its provisions meaningless and in a manner that gives effect to all of the contractual terms." (Citation and punctuation omitted.) *Spirits Inc. v. Patel*, 350 Ga. App. 153, 155 (1) (828 SE2d 381) (2019); accord *Barrow County Airport Auth. v. Romanair, Inc.*, 254 Ga. App. 722, 725 (4) (563 SE2d 467) (2002) ("[A] court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless.") (citation and

punctuation omitted). "The law favors a construction that will uphold the contract as a whole, and the whole contract should be looked to in arriving at the construction of any part." (Citation and punctuation omitted.) *Tachdjian*, 256 Ga. App. at 170; see also OCGA § 13-2-2 (4). Accordingly, "[t]he interpretation of Section 1 (l) of the lease] should be governed by the intent of the parties as expressed in the entire lease contract." *Dept. of Transp. v. Calfee Co. of Dalton*, 202 Ga. App. 299, 301 (1) (414 SE2d 268) (1991). In addition, as a general rule, provisions of a lease should be construed against the lessor. See *Rainbow USA, Inc. v. Cumberland Mall, LLC*, 301 Ga. App. 642, 644 (1) (688 SE2d 631) (2009); OCGA § 13-2-2 (5) ("If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred[.]").

As stated above, the lease at issue is internally inconsistent and the use of future and present tenses within various sections does not clarify the definition of Parking Facilities and how many, if any, spaces AMAC presently may be entitled to exclusively use during the hours of 5:30 p.m. and 5:00 a.m. It is clear that the parties intended to give the restaurant exclusive evening parking rights to some number of spaces when the agreement was signed; however, it is not clear whether the parties intended the number of exclusive evening spaces to fluctuate with changes in the

13

City's regulations. Indeed, the present tense used in Section 1 (l) may well signify, as the trial court found, that the parties intended that AMAC's right to exclusive evening parking spaces would be subject to change when the City altered its requirements. On the other hand, the use of the future tense in other portions of the contract, as well as Section 2's reference to the Lease of Premises encompassing exclusive use of the Parking Facilities between 5:30 p.m. and 5:00 a.m., without any contingency language, may signify that the parties intended that AMAC's right to exclusive evening parking spaces was based on the City's regulation when the lease was signed.

To further obfuscate the issue, AMAC argues that the parenthetical language in Section 1 (l) simply refers to the number of parking spaces Web was required to include in the parking lot. If that is the case, then the lot should be comprised of "no more than 87 spaces," yet Exhibit B shows 94 spaces. Although the poorly written parenthetical language might refer to the minimum size of the lot as "the number of spaces which are required by the City" and allot AMAC exclusive use of 87 of the 94 spaces from 5:30 p.m. to 5:00 a.m., it is impossible for this Court to determine the parties' intent merely by looking at the four corners of the lease. Even construing the lease provisions against the landlord and in favor of AMAC, see *Calfee Co. of*

*Dalton*, 202 Ga. App. at 302 (1), the ambiguous language in the lease is uncertain as to the parties' intent and open to more than one interpretation regarding AMAC's present entitlement to exclusive evening parking spaces and the number, if any, of those spaces. See *Citrus Tower Boulevard Imaging Center*, 325 Ga. App. at 8 (2). This Court, therefore, cannot resolve the ambiguities or determine whether the City's 2020 Ordinance impacts any right AMAC might have to exclusive evening parking spaces.

AMAC argues in its appellate brief that Section 45 of the lease provides that the parties' contractual obligations would continue during the lease unless a provision becomes "illegal, invalid or unenforceable under present or future laws," and this clause, in conjunction with the principle that "[a] newly enacted law cannot impair the obligations of an existing contract[,]" *Marek Interior Systems v. White*, 230 Ga. App. 518, 520 (1) (469 SE2d 749) (1998) (citation and punctuation omitted), confirm that AMAC's exclusive evening parking rights continued after the 2020 City Ordinance. However, the ambiguous language in the lease and the possibility that AMAC agreed to tie its exclusive evening parking rights to the City's requirements, which could change over the term of the lease, make it impossible for us to accept AMAC's argument.

15

Web argues in its appellate brief that even if AMAC's exclusive evening parking rights are not governed by present City of Atlanta requirements, a special stipulation in the lease authorizes Web to relocate parking spaces provided to AMAC to a contiguous property without notice. Indeed, Special Stipulation 1 states as follows:

> Tenant agrees that the location of the parking spaces provided to Tenant may be modified by Landlord at any time after the expiration or other termination of the Turner Lease, during the term of this Lease, provided that (i) the relocated spaces are located on or contiguous to the property upon which the Premises are located, (ii) the use of such relocated spaces by Tenant allows Tenant to comply with all applicable requirements imposed upon Tenant by licensing or other governmental authorities, and (iii) Landlord pays all costs associated with such relocation.

Web further asserts that the USPS parking lot Web leases is contiguous to the property. Once again, however, given the ambiguous language in the lease, it is impossible for this Court to determine the number of exclusive evening parking spaces, if any, to which AMAC presently may be entitled under the lease, and, in any case, Web has not provided any evidence that it made efforts to comply with Special Stipulation 1. Accordingly, Web's argument does not impact this Court's decision.

When "ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury." (Citation and punctuation omitted.) *Marvel Enterprises*, 271 Ga. App. at 610 (2); accord *Snipes*, 273 Ga. App. at 815 (1). We therefore find that the question as to what the parties intended regarding exclusive evening parking spaces for the restaurant is an issue of fact for the jury to resolve. See *Tachdjian*, 256 Ga. App. at 171. The trial court's order to the contrary — specifically, its conclusion that AMAC's claims for declaratory judgment, specific performance, breach of contract and anticipatory breach of contract against Web must fail as a matter of law based on unambiguous language in the 2003 lease — is reversed. However, the trial court's denial of AMAC's motion for partial summary judgment regarding its entitlement to exclusive evening parking spaces based on the 2003 lease is affirmed.

2. AMAC next asserts that the trial court erred by entering summary judgment on its tortious interference claim related to a valet contract with Eagle. We disagree.

"Parties to a contract have a property right therein with which a third party cannot interfere without legal justification or privilege, and a party injured by another's wrongful interference may seek compensation in tort." *Atlanta Mkt. Center*

*Mgmt. Co. v. McLane*, 269 Ga. 604, 608 (2) (503 SE2d 278) (1998). To recover under a theory of tortious interference with contractual relations, a plaintiff must establish:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligation or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

(Citation and punctuation omitted.) *Rowell v. Phoebe Putney Mem. Hosp.*, 338 Ga. App. 603, 604 (1) (791 SE2d 183) (2016). A plaintiff's failure to establish even one of the elements entitles a defendant to summary adjudication. See *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991) ("If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial.").

Construing the facts in the light most favorable to AMAC as the nonmovant, see *Brown*, 351 Ga. App. at 352, the record shows that on November 1, 2019, Two Urban Licks entered into a two-year Management Agreement for Valet Parking Services with Eagle. The contract contained an exclusivity clause in Section 2: "The

18

Services shall consist of exclusive valet parking [of] automobiles belonging to patrons of [Two Urban Licks] during [its] normal business hours." Joe Crawford, the senior property manager for a commercial real estate company that managed Common Ground for Web, testified that a valet stand is located in front of Two Urban Licks, and AMAC told him it had a valet contract with Eagle, though he never saw a signed contract. Crawford knew that Two Urban Licks used the valet service and that it impacted the other tenants on the property. In fact, in March 2021, one of the other tenants informed Web in writing that the valet service was giving priority to Two Urban Licks and turning its customers away. In response, the property management company sent an internal email asking "if there has been any talk about Common Ground being in charge of the valet situation and not Two Urban Licks[.]" Thereafter, Web attempted to gain control of valet parking at Common Ground so that the property would have one parking lot that everyone shared. Crawford knew "there was a dispute over the amount of parking spaces that Two Urban said was allotted towards them and a balancing act with the other tenants of the property."

On July 15, 2021, Web issued a written directive from its attorney to Eagle. The email stated as follows:

Web, Ltd. ("Web") (the owner/landlord) seeks to provide a positive parking experience for all of its tenant's customers. As such, Eagle shall take all direction from Web, not from any individual tenant. Should there be any issue with respect to a tenant or tenants asking for special favors/accommodations, including, but not limited to, preferential parking for its customers and/or the reservation of any parking spaces, Eagle shall notify property management immediately so that Web is made aware.

Eagle shall not demonstrate a preference to any tenant's customers on Web's property (as shown on the attached map). All customers shall be parked on a first come, first served basis.

The Lease between Web and AMAC Two d/b/a Two Urban Licks ("AMAC") does not reserve any specific parking spaces to AMAC. We understand that AMAC has told Eagle it has exclusive rights in and to the spaces directly in front of the building on Web's property; that is incorrect. The current Beltline Zoning ordinances require a minimum of zero parking spaces for this property. The Lease provides AMAC with a minimum number of spaces in accordance with said zoning requirements (i.e. zero), and even if parking spaces were required (they are not), the Lease only covers the time frame between 5:30 p.m. and 5:00 a.m. . . . Web does not dispute that since the directive, Eagle has taken direction only from Web and parked cars in Web's lot on a first come, first served basis to be fair to all tenants.

Based on these actions, AMAC amended its complaint to allege a claim against Web for tortious interference with AMAC's valet contract with Eagle. Web moved for summary judgment on the claim, and the trial court granted Web's motion for summary judgment, specifically finding that: (i) Web did not act improperly and without privilege; (ii) Web did not act purposely and with malice with the intent to injure AMAC; and (iii) Web did not induce Eagle to not enter or discontinue its contract with AMAC.

Pretermitting whether the trial court erred in holding that AMAC failed to show any evidence of malice or inducement not to enter or discontinue a contract by Web, we conclude that the trial court correctly granted summary judgment to Web on AMAC's claim for tortious interference because Web did not act improperly and without privilege. The Supreme Court of Georgia has stated that "without privilege" in the first element "means that the defendant is a stranger to the business relationship" or contract.[1] (Citation and punctuation omitted.) *Metro Atlanta Task Force for the Homeless v. Ichthus Community Trust*, 298 Ga. 221, 230 (2) (c) (i) (780 SE2d 311) (2015); accord *Healthy-IT, LLC v. Agrawal*, 343 Ga. App. 660, 670 (6)

---

[1] The applicability of the "stranger doctrine" is the same for tortious interference with a contractual relationship as it is for tortious interference with a business relationship. See *McLane*, 269 Ga. at 609 (2), n. 2.

(808 SE2d 876) (2017) ("To establish that the tortfeasor acted *without* privilege, a plaintiff must show that the alleged tortfeasor is a third party or a stranger to the contract or business relation at issue."). "One is not a stranger to the contract just because one is not a party to the contract[.]" *McLane*, 269 Ga. at 608 (2). "[A] party, under appropriate circumstances, can be a non-signer of a particular contract and yet not be a stranger to the contract itself or to the business relationship giving rise thereto and underpinning it." (Citation omitted.) *Renden, Inc. v. Liberty Real Estate Ltd. Partnership III*, 213 Ga. App. 333, 336 (2) (b) (444 SE2d 814) (1994). For example, where a defendant has "a legitimate interest in either the contract or a party to the contract, the defendant is not a stranger to the contract," even if the defendant is not a signer of a particular contract. *Disaster Svcs. v. Erc Partnership*, 228 Ga. App. 739, 741 (492 SE2d 526) (1997); accord *Healthy-IT*, 343 Ga. App. at 671 (6). "In sum, all parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." (Citation and punctuation omitted.) *Cox v. City of Atlanta*, 266 Ga. App. 329, 333 (1) (596 SE2d 785) (2004); see also *J. Kinson Cook of Ga. v. Heery/Mitchell*, 284 Ga. App. 552, 557 (b) (644 SE2d 440) (2007).

22

In this case, the evidence is clear that the contractual relationship at issue involves a tenant contracting with a valet company to park cars on the landlord's property. Mindful of the Supreme Court's suggestion that we "reduce the number of entities against which a claim of tortious interference with contract may be maintained[,]" *McLane*, 269 Ga. at 610 (2), we agree with the trial court that Web was not a stranger to AMAC's contract with Eagle. First of all, it is undisputed that Web, not AMAC, owns the parking lot at Common Ground where Eagle provides valet services. Second, AMAC's lease with Web does not provide for valet services or authorize AMAC to contract with a valet company to park cars in Web's parking lot. Finally, Web, as the landlord, has an absolute right to contract with a valet company to park cars on its property. In fact, AMAC's contract with Eagle uses parking spaces on the landlord's property to the detriment of other tenants. "The exercise of an absolute legal right is not and cannot be considered an interference with a contractual or potential contractual relationship." *Disaster Svcs.*, 228 Ga. App. at 742. We conclude that Web is an essential entity in the relationship between its tenant and a valet company parking automobiles on Web's property; thus, the relationship between AMAC and Eagle is "inextricably a part of the predominant leasing relationship between the landlord . . . and its tenant[.]" *Renden*, 213 Ga. App. at 335-336 (2) (b).

23

AMAC argues in its appellate brief that the cases cited by the trial court and Web are distinguishable from the present situation, but AMAC fails to offer any contrary authority demonstrating that the issue presented in this case should be handled differently and resolved by a jury rather than by the trial court as a matter of law. In addition, although AMAC argues that there is a question of material fact regarding whether Web knew about AMAC's contractual rights with Eagle, AMAC does not explain how this alters the stranger doctrine analysis.

While this Court recognizes that AMAC's contract with Eagle potentially evolved due to the dispute between AMAC and Web concerning AMAC's current right to exclusive evening parking spaces, there is no question that AMAC had no basis to control Web's parking lot at any time. Tortious interference with contractual relations was not a proper tort to aver in this case, see *Renden*, 213 Ga. App. at 336 (2) (b), and the trial court did not err in granting summary judgment to Web on this claim.

3. CC&C argues that the trial court erred in granting summary judgment to Web on CC&C's trespass claim. We again disagree.

"A person commits trespass when he knowingly and without authority enters upon the land of another after having received prior notice that such entry is

24

forbidden." *Pope v. Pulte Home Corp.*, 246 Ga. App. 120 (1) (539 SE2d 842) (2000);

see also *TMX Finance Holdings v. Drummond Financial Svcs.*, 300 Ga. 835, 837-838

(1) (797 SE2d 842) (2017) (holding in a case involving an injunction that the plaintiff

was unlikely to succeed on the merits of a trespass claim because the record showed

that the plaintiff did not have a right to exclude a defendant from parking lots that it

shared with other businesses). "[T]he act of trespass must have been a voluntary,

intentional act in that it intended the immediate consequences of the act, causing the

trespass or invasion, i.e., an intended act as opposed to a negligent act." (Citation and

punctuation omitted.) *Rouse v. City of Atlanta*, 353 Ga. App. 542, 546 (2) (a) (839

SE2d 8) (2020).

The record in this case shows that CC&C entered into a licensing agreement

with USPS for the "exclusive" use of parking spaces in a Postal Service lot adjacent

to Common Ground. The licensing agreement was for the use of 42 of the 65 to 80

striped parking spaces[2] in the USPS lot, and the agreement notes that the term

commenced on May 1, 2015 and expired on April 30, 2020. According to the

_____

[2] The licensing agreement states it is for 50 spaces, but a CC&C representative testified that the license was amended and CC&C has always leased 42 spaces. The plaintiffs' complaint also alleges that CC&C "currently licenses 42 spaces in the Postal Service Lot."

agreement, the license could "be renewed at the option of the Licensee, provided written notice [was] received by the Contracting Officer 60 days prior to the end of the fixed terms and each and every renewal term thereafter for the following separate and consecutive terms" at specified annual rentals. CC&C argues that it continues to license spaces from USPS and to pay USPS for those spaces, but it admits that no written notice of renewal was sent to USPS, and the record does not contain a renewed license or other documentation confirming the renewal. In addition, it is undisputed that Web also leases parking spaces from USPS in the same lot. In fact, CC&C admits that Web produced an Outlease Agreement for 42,630 square feet in the USPS lot, and CC&C acknowledges that there might be some overlap between their leases with USPS.

CC&C's complaint for trespass alleges that in June 2021, Web contractors resurfaced and striped Web's parking lot and a portion of USPS's parking lot, including some of CC&C's exclusive parking spaces in the USPS lot, without authorization or permission from CC&C, "thereby trespassing on CC&C's exclusive parking spaces, and blatantly attempt[ing] to exercise dominion over these parking spaces." However, the managing partner of AMAC and a representative for CC&C testified that Web resurfaced and restriped its own parking lot, not the USPS parking

lot, because Web "didn't have the rights to pave the U.S. Postal Service property." This representative further acknowledged that AMAC and CC&C do not have an issue with the fact that the USPS lot was resurfaced and restriped; their concern addresses the timing of the maintenance work, and he admitted that CC&C has not incurred any monetary damages. Additionally, the sole managing member of CC&C testified that he is the only one with authority to make decisions as it relates to CC&C, that he was not aware that CC&C had brought a trespass claim in this case, and that he could not quantify CC&C's damages. In fact, the only evidence Web cites to support its trespass claim is testimony from a Web representative acknowledging that he has seen pictures in which it "appear[s]" that Web's contractor "maybe" restriped four or five USPS parking lot spaces in the area where CC&C contends it licenses spaces from USPS. The trial court found that CC&C lacked standing to bring claims related to its expired license of spaces in the USPS lot and failed to demonstrate the elements of a trespass claim.

Pretermitting whether CC&C has standing to bring a trespass claim regarding USPS's property, its trespass claim fails as a matter of law because CC&C has failed to establish the elements of a trespass claim. Even assuming that a Web contractor "restriped spaces in the area that CC&C licenses from the Postal Service," CC&C has

27

not demonstrated that Web "knowingly and without authority enter[ed] upon the land of another after having received prior notice that such entry is forbidden." *Pope*, 246 Ga. App. at 120 (1). First, a CC&C representative testified that Web did not resurface or restripe any of its spaces in the USPS lot, and the sole managing member of CC&C did not know that a trespass claim had been filed. Moreover, even if Web's contractor performed maintenance work on four or five parking spaces actually leased by CC&C in the USPS lot, the record does not show that Web knowingly entered CC&C land because there is no evidence that Web intentionally directed its contractor to perform maintenance work on CC&C's spaces in the USPS lot, and a negligent act cannot support a claim for trespass. *Rouse*, 353 Ga. App. at 546-547 (2) (a). In addition, there is no evidence that Web knew the four or five spaces potentially restriped in the USPS lot were leased by CC&C in June 2021 when the maintenance work was performed because CC&C's license on its face was expired, and Web also had a contract with USPS to lease parking spaces in the USPS lot (a contract that may have overlapped with CC&C's). Finally, CC&C has failed to point to any evidence in the record showing that Web received prior notice that entry on the portion of the USPS lot potentially leased by CC&C was forbidden. The trial court did not err in granting Web's motion for summary judgment on CC&C's trespass and related claims.

28

In summary, we find the lease language ambiguous regarding AMAC's right to exclusive parking spaces, and because the parties' intent is impossible for us to resolve using contract construction rules, we conclude that the question as to what the parties intended regarding exclusive evening parking spaces for the restaurant is an issue of fact for the jury to resolve. We therefore reverse the trial court's grant of summary judgment to Web and affirm the denial of partial summary judgment to AMAC on AMAC's claims for declaratory judgment, specific performance, breach of contract, and anticipatory breach of contract surrounding Web's alleged failure to recognize AMAC's exclusive parking rights under the lease. However, we affirm the trial court's grant of summary judgment to Web on AMAC's tortious interference and trespass claims for the reasons stated in Divisions 2 and 3.

*Judgment affirmed in part and reversed in part. Mercier, C. J., and Miller, P. J., concur.*